## MANAGING MEMBER'S CERTIFICATE

Effective as of December 30, 2015, the undersigned ("**Affiant**") hereby certifies that Affiant is the Managing Member of **FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC**, a California limited liability company ("**FCREI**"), the sole member of **FIRST CAPITAL HOBBS, LLC**, a Delaware limited liability company ("**Borrower**") and is authorized to execute and deliver this Managing Member's Certificate (the "**Certificate**"), and Affiant further certifies as follows:

1.     That I am the Managing Member of FCREI and have personal knowledge of FCREI's and Borrower's records and each of the matters specified herein.

2.     That a true, complete and correct copy of the Articles of Organization of FCREI, as of the date hereof, is attached hereto as Exhibit A and incorporated herein by reference for all purposes, and that a true, complete and correct copy of the Operating Agreement (the "FCREI Operating Agreement") of FCREI and all amendments thereto, as of the date hereof, is attached hereto as Exhibit B and incorporated herein by reference for all purposes.

3.     That FCREI is in existence and in good standing in the state of its organization, as evidenced by the certificate of existence and good standing from the Secretary of State of the State of California attached hereto as Exhibit C.

4.     That a true, complete and correct copy of the Articles of Organization of Borrower, as of the date hereof, is attached hereto as Exhibit D and incorporated herein by reference for all purposes, and that a true, complete and correct copy of the Operating Agreement (the "Borrower Operating Agreement") of Borrower and all amendments thereto, as of the date hereof, is attached hereto as Exhibit E and incorporated herein by reference for all purposes

5.     That Borrower is in existence and in good standing in the state of its organization, as evidenced by the certificate of existence and good standing from the Secretary of State of the State of Delaware attached hereto as Exhibit F.

6.     That Exhibit G attached hereto and incorporated herein by reference is a true, complete and correct restatement of certain resolutions adopted on or before the date hereof, at a regular or special meeting of the members of FCREI duly convened at which a quorum was present or by unanimous written consent of the members of FCREI, which such meeting or unanimous consent was and is in the form required by and in conformity with the Borrower's Certificate of Formation, Operating Agreement, and all applicable law (the "Resolutions").  Affiant hereby certifies that the Resolutions have been adopted in conformity with and as required by all terms and provisions of the Operating Agreement.

7.     That the following named persons are the authorized signatories of Borrower, and that the signature set out opposite the name of each such person is the genuine signature of such person, to-wit:

|             Name             |             Signature             |
|------------------------------|-----------------------------------|
| Suneet Singal                |                                   |

Exhibit 17

IN WITNESS WHEREOF, I have hereunto set my hand to be effective as of the date set forth in the first paragraph hereof.

**AFFIANT**:

_____

Suneet Singal, Managing Member of First Capital Real Estate Investments, LLC, a California limited liability company

STATE OF _____  §
                                        §
COUNTY OF _____     §

Subscribed and sworn to (or affirmed) before me on December ___, 2015, by Suneet Singal, Managing Member of First Capital Real Estate Investments, LLC, a California limited liability company, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

*See Attached 2015*
*CA Approved Verbiage —* _____
                          Notary Public

MANAGING MEMBER'S CERTIFICATE *(First Capital Hobbs)* – Signature Page

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of *Sacramento*

Subscribed and sworn to (or affirmed) before me on this *30th* day of *Dec*____, 20 *15* by ____ *Suneet Singal*____,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

THOMAS L. STEINBACH
Commission # 2069759
Notary Public - California
Sacramento County
My Comm. Expires Jun 26, 2018

(Seal)                          Signature _____

*Managing Member's Certificate*

**EXHIBIT A**

**Articles of Organization**

The Articles of Organization of FCREI follows this cover page.

# State of California
## Secretary of State



I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ____1____ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF, I** execute this certificate and affix the Great Seal of the State of California this day of

_____

DEBRA BOWEN
Secretary of State

Apr 09 11 10:29a      SDHC                          19164184970                      p.2

**20 08 036 10 181**  File # _____



| LLC-1 |
|---|

## State of California
### Secretary of State

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

FEB 0 5 2008

| A $70.00 filing fee must accompany this form. | |
|---|---|
| **IMPORTANT – Read instructions before completing this form.** | This Space For Filing Use Only |

**ENTITY NAME** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

First Capital Real Estate Investments LLC

**PURPOSE** (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**INITIAL AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

Suneet Singal

| 4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 101 Barnhart Circle | Sacramento | CA | 95835 |

**MANAGEMENT** (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

[✓] ONE MANAGER

[ ] MORE THAN ONE MANAGER

[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

**ADDITIONAL INFORMATION**

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**EXECUTION**

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

1/31/2008
DATE

SIGNATURE OF ORGANIZER

Suneet Singal
TYPE OR PRINT NAME OF ORGANIZER

| LLC-1 (REV 04/2007) | APPROVED BY SECRETARY OF STATE |
|---|---|

**<u>EXHIBIT B</u>**

**<u>Operating Agreement</u>**

The Operating Agreement of FCREI follows this cover page.

Apr 09 11 10:29a    SDHC                                    19164184970            p.3

## OPERATING AGREEMENT
### OF
### First Capital Real Estate Investments, LLC
### a California Limited Liability Company

By this **OPERATING AGREEMENT** (the **"Agreement"**), made and entered into on March 13th, 2008. those persons whose names, addresses and signatures are set forth below, being the Members of First Capital Real Estate Investments, LLC (the "Company"), hereby represent and agree that they have filed, on behalf of the Company, Articles of Organization with the Secretary of State for the State of California, and that they desire to enter into an operating agreement in accordance with the Beverly-Killea Limited Liability Company Act (the "Act").

NOW, THEREFORE, the Members agree as follows:

### ARTICLE   I.
### DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the meanings provided below:

Section 1.1. "Act."

"Act" means the Beverly-Killea Limited Liability Company Act, contained in California Corporations Code sections 17000 et seq., as amended from time to time.

Section 1.2. "Affiliate."

"Affiliate" of a Member means any Person under the control of, in common control with, or in control of a Member, whether that control is direct or indirect. The term "control," as used herein, means, with respect to a corporation or limited liability company, the ability to exercise more than fifty percent (50%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

Section 1.3. "Agreement."

"Agreement" means this Operating Agreement, in its original form and as amended from time to time.

Section 1.4. "Articles."

"Articles" means the Articles of Organization filed with the California Secretary of State forming this limited liability company, as initially filed and as they may be amended from time to time.

Section 1.5. "Bankruptcy."

"Bankruptcy" means, with respect to any Person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

Section 1.6. "Capital Account."

"Capital Account" means the amount of the capital interest of a Member in the Company, consisting of the amount of money and the fair market value, net of liabilities, of any property initially contributed by the Member, as: (1) increased by any additional contributions and the Member's share of the Company's profits; and (2) decreased by any distribution to that Member as well as that Member's share of Company losses.

Section 1.7. "Capital Contribution."

"Capital Contribution" means the total amount of money and the fair market value, net of liabilities, of any property contributed by the Members to the Company.

Section 1.8. "Code."

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision of any succeeding revenue law.

Section 1.9. "Company."

"Company" means First Capital Real Estate Investments, LLC, the entity formed in accordance with this Agreement and the Articles.

Section 1.10. "Company Minimum Gain."

"Company Minimum Gain" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations section 1.704-2(d). [26 C.F.R. § 1.704-2(d)]

Section 1.11. "Corporations Code."

"Corporations Code" means the California Corporations Code, as amended from time to time, and the provisions of any succeeding law.

Section 1.12. "Departing Member."

"Departing Member" means any Member whose conduct results in a Dissolution Event or who withdraws from the Company in accordance with Section 4.3, where such withdrawal does not result in dissolution of the Company.

2

Section 1.13. "Dissolution Event."

"Dissolution Event" means, with respect to any Member, one or more of the following: the death, resignation, retirement, expulsion, bankruptcy, or dissolution of any Member.

Section 1.14. "Distribution."

"Distribution" means the transfer of money or property by the Company to the Members without consideration.

Section 1.15. "Fiscal Year."

"Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

Section 1.16. "Majority Interest."

"Majority Interest" means the interest of the Members holding greater than fifty percent (50%) of the total interests held by the Members.

Section 1.17. "Member."

"Member" means each Person who: (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not engaged in conduct resulting in a Dissolution Event or terminated membership for any other reason.

Section 1.18. "Member Nonrecourse Debt."

"Member Nonrecourse Debt" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations section 1.704-2(b)(4). [26 C.F.R. § 1.704-2(b)(4)]

Section 1.19. "Member Nonrecourse Deductions."

"Member Nonrecourse Deductions" means items of Company loss, deduction, or Code section 705(a)(2)(B) [26 U.S.C.A. § 705(a)(2)(B)] expenditures which are attributable to Member Nonrecourse Debt.

Section 1.20. "Membership Interest."

"Membership Interest" means a Member's rights in the Company, collectively, including the Member's economic interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the Act.

3

Section 1.21. "Negative Capital Account."

"Negative Capital Account" means a Capital account with a balance of less than zero.

Section 1.22. "Net Profits" and "Net Losses."

"Net Profits" and "Net Losses" mean the Company's income, loss, and deductions computed at the close of each fiscal year in accordance with the accounting methods used to prepare the Company's information tax return filed for federal income tax purposes.

Section 1.23. "Nonrecourse Liability."

"Nonrecourse Liability" has the meaning provided in the Regulations section 1.752-1(a)(2). [26 C.F.R. § 1.752-1(a)(2)]

Section 1.24. "Percentage Interest."

"Percentage Interest" means the percentage ownership of the Company of each Member as set forth in the column entitled "Member's Percentage Interest" contained in Exhibit A attached hereto and as recalculated from time to time pursuant to this Agreement.

Section 1.25. "Person."

"Person" means an individual, partnership, limited partnership, corporation, limited liability company, registered limited liability partnership, trust, estate, association, or any other entity.

Section 1.26. "Positive Capital Account."

"Positive Capital Account" means a Capital Account with a balance greater than zero.

Section 1.27. "Regulations."

"Regulations," as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations which may be promulgated.

Section 1.28. "Remaining Members."

"Remaining Members" means, upon the occurrence of a Dissolution Event, those Members of the Company whose conduct did not cause its occurrence.

Section 1.29. "Secretary of State."

"Secretary of State" means the Secretary of State for the State of California.

4

Section 1.30. "Tax Matters Member" ("Tax Matters Partner")

"Tax Matters Partner," as defined in Code section 6231(a)(7) [26 U.S.C.A. § 6231(a)(7)], is that Person designated by the Company in Section 8.6 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

## ARTICLE II.
## FORMATION AND ORGANIZATION

Section 2.1. Initial Date and Initial Parties.

This Agreement is first entered into on March 13th, 2008, by and among the Company and the persons who are Members of the Company on that date.

Section 2.2. Subsequent Parties.

No person may become a Member of the Company without agreeing to and becoming a signatory of this Agreement and any offer or assignment of a Membership interest is contingent upon the fulfillment of this condition.

Section 2.3. Name.

The name of this Company is First Capital Real Estate Investments, LLC.

Section 2.4. Term.

The Company commenced upon the filing of its Articles of Organization and it shall continue in existence until January 1, 2100, unless terminated earlier under the provisions of the Act or such earlier time as determined in accordance with the provisions of this Agreement.

Section 2.5. Principal Place of Business.

The Company will have its principal place of business at:
101 Barnhart Circle Sacramento CA 95835

or at any other address within the State of California upon which the Members agree. The Company shall maintain its principal executive offices at its principal place of business, as well as maintaining at that location all records and documents which it is required to keep by Corp. Code § 17058.

5

Section 2.6. <u>Resident Agent.</u>

The name and address of the Company's agent for service of process in the State of California is Suneet Singal at 101 Barnhart Circle Sacramento CA 95835.

Section 2.7. <u>Names and Addresses of Members.</u>

The name, present mailing address, taxpayer identification number, and percentage ownership of each Member is listed on Exhibit A attached hereto.

Section 2.8. <u>Authorization and Purpose.</u>

Pursuant to the Beverly-Killea Limited Liability Company Act, the Members have formed this Company and have filed Articles with the Secretary of State. The Members intend to govern the Company in accordance with the Act, the Articles, and this Agreement and to have their rights and liabilities in connection with the Company to be so determined. In the event of any conflict between the Act and the Articles and Agreement, this Agreement will control, to the extent permitted by the Act.

The purpose of the Company is to engage in any lawful business activity that is permitted by the Act.

## ARTICLE III.
## CAPITAL CONTRIBUTIONS AND ACCOUNTS

Section 3.1. <u>Initial Capital Contributions.</u>

The initial Capital Contribution of each Member is listed in Exhibit A attached hereto. Exhibit A shall be revised to reflect any additional contributions pursuant to Section 3.2.

Section 3.2. <u>Additional Contributions.</u>

No Member shall be required to make any additional contribution to the Company. However, upon agreement by all the Members that additional capital is desirable or necessary, any Member may, but shall not be required to, contribute additional capital to the Company on a pro rata basis consistent with the Percentage Interest of each of the Members. Upon receipt of such additional contributions, the Members' capital accounts shall be adjusted accordingly.

Section 3.3. <u>Interest Payments.</u>

No Member shall be entitled to receive interest payments in connection with any contribution of capital to the Company.

Section 3.4. <u>Right to Return of Contributions.</u>

6

No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement in Article IX.

Section 3.5. Capital Accounts.

A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations section 1.704-1(b)(2)(iv) [26 C.F.R. § 1.704-1(b)(2)(iv)], which shall reflect all Capital Contributions to the Company. Should any Member transfer or assign all or any part of his or her membership interest in accordance with this Agreement, the successor shall receive that portion of the Member's Capital Account attributable to the interest assigned or transferred.

Section 3.6. Failure of Member to Make Contribution.

All Members shall make timely payment to the Company of required Capital Contributions. The failure of any Member to make such a contribution will render him or her in default and may result in the loss of the Member's ability to participate in Management. Further, a Member who is in default may have his or her proportionate interest in the Company diluted, reduced, or even eliminated, depending on the extent and circumstances of the default.

## ARTICLE IV.
## MEMBERS

Section 4.1. Limitation of Liability.

No Member shall be personally liable for the debts, obligations, liabilities, or judgments of the Company solely by virtue of his or her membership in the Company, except as expressly set forth in this Agreement or as required by law.

Section 4.2. Additional Members.

Additional Members may be admitted to the Company only if approved unanimously by the Company Membership. Additional Members shall be permitted to participate in management at the discretion of the existing Members. Likewise, the existing Members shall determine an Additional Member's participation in "Net Profits," "Net Losses," and distributions, as those terms are defined in Article I. Exhibit A shall be amended to include the name, present mailing address, taxpayer identification number, and percentage ownership of any Additional Members.

Section 4.3. Withdrawal from Membership.

Any Member who is under an obligation to render services to the Company may withdraw at any time after sixty (60) days' written notice to the Company, without prejudice to the rights of the Company or any Member under any contract to which the

7

withdrawing Member is a party. Such withdrawing Member shall have the rights of a transferee under Article VII and the Remaining Members shall be entitled to purchase the withdrawing Member's Membership interest in accordance with Section 7.6. In the event of such a withdrawal, Exhibit A shall be amended to reflect the change in ownership interests. No other Members are permitted to withdraw from the Company.

Section 4.4. Competing Activities.

The Members expressly acknowledge and agree that they, as well as any Affiliate or shareholder of a Member, are permitted to participate in other business activities that may be in competition, direct or indirect, with those of the Company. The Members further acknowledge that they are under no obligation to present to the Company any business or investment opportunities, even if the opportunities are of such a character as to be appropriate for the Company's undertaking. Each Member hereby waives the right to any claim against any other Member or Affiliate on account of such competing activities.

Section 4.5. Compensation of Members.

No Member or Affiliate shall be entitled to compensation for services rendered to the Company, absent agreement by the Members. However, Members and Affiliates shall be entitled to reimbursement for the actual cost of goods and services provided to the Company, including, without limitation, reimbursement for any professional services required to form the Company.

Section 4.6. Transactions with Company.

A Member may lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the Act. To the extent permitted by applicable laws, such a Member shall be treated like any other Person with respect to transactions with the Company.

Section 4.7. Members Are Agents.

It is the intent of each of the Members of this Company to participate actively in the management of the Company and to act as the agents of the Company, except as limited by the provisions contained in Article V.

Section 4.8. Meetings.

There will be no required regular or annual meetings of the Members. However, any Member may call a meeting at any time. Meetings of the Members shall be held at the Company's principal executive office or at any other place within the State of California, Sacramento County selected by the Member calling the meeting.

Written notice of the meeting shall be provided to all Members entitled to vote at the meeting. Notice shall be given in accordance with the requirements of Corp. Code §

8

17104. Any meetings of the Members shall be conducted in accordance with all of the requirements under the Act. Unless otherwise provided in this Agreement, approval of any matters coming before the Membership may be obtained by a majority vote of the Members.

### ARTICLE V.
### MANAGEMENT

Section 5.1. Management by Members.

The Company shall be managed by one of the Members who is elected to manage the company by majority vote of the Members. The Managing Member has the authority to manage and control the Company and to act on its behalf, except as limited by the Act or this Agreement.

Section 5.2. Time Commitments of Members.

Each Member shall devote whatever time he or she reasonably believes is necessary to conduct the affairs of the Company and to attend to all matters concomitant to the business of the Company.

Section 5.3. Limitations on Power of Members.

Notwithstanding any of the foregoing, the consent of all the Members is required to incur a debt or obligation on behalf of the Company that is in excess of $1,000.00. The signature of all Members is required to enter into contracts on behalf of the Company. No Member may undertake the following acts on behalf of the Company without first obtaining the consent of all the Members:

(a) the approval of a sale, transfer, exchange, assignment, or other disposition of all or any part of a Member's interest in the Company and admission of the Assignee as a Member of the Company;

(b) the decision to continue to operate the business of the Company after the occurrence of a Dissolution Event;

(c) the sale or other disposition of all or a substantial part of the Company's assets, whether occurring as a single transaction or as a series of transactions over a *[number]*-month period, except if the same is part of the orderly liquidation and winding up of the Company's affairs upon the dissolution of the Company;

(d) the merger of the Company with any other business entity;

(e) the confession of a judgment against the Company;

9

(f) any act which would prevent the Company from conducting its duly authorized business; and

(g) any other act for which the consent of the Members is required, either in this Agreement or under the Act.

Section 5.4. <u>Limitation on Exposing Members to Personal Liability.</u>

Neither the Company nor any Member thereof may take any action that will have the effect of exposing any Member of the Company to personal liability for the obligations of the Company, without first obtaining the consent of the affected Member.

Section 5.5. <u>Fiduciary Duties.</u>

The fiduciary duties a Member owes to the Company and to the other Members of the Company are those of a partner to a partnership and to the partners of the partnership.

Section 5.6. <u>Liability for Acts and Omissions.</u>

As long as a Member acts in accordance with Section 5.5, no Member shall incur liability to any other Member or to the Company for any act or omission which occurs while in the performance of services for the Company.

## ARTICLE VI.
## ALLOCATION OF PROFIT AND LOSS

Section 6.1. <u>Compliance with the Code and Regulations.</u>

The Company intends to comply with the Code and all applicable Regulations, including without limitation the minimum gain chargeback requirements, and intends that the provisions of this Article be interpreted consistently with that intent.

Section 6.2. <u>Net Profits.</u>

Except as specifically provided elsewhere in this Agreement, Distributions of Net Profit shall be made to Members in proportion to their Percentage Interest in the Company.

Section 6.3. <u>Net Losses.</u>

Except as specifically provided elsewhere in this Agreement, Net Losses shall be allocated to the Members in proportion to their Percentage Interest in the Company. However, the foregoing will not apply to the extent that it would result in a Negative Capital Account balance for any Member equal to the Company Minimum Gain which would be realized by that Member in the event of a foreclosure of the Company's assets. Any Net Loss which is not allocated in accordance with the foregoing provision shall be allocated to other Members who are unaffected by that provision. When subsequent

allocations of profit and loss are calculated, the losses reallocated pursuant to this provision shall be taken into account such that the net amount of the allocation shall be as close as possible to that which would have been allocated to each Member if the reallocation pursuant to this section had not taken place.

\\\\

Section 6.4. Regulatory Allocations.

Notwithstanding the provisions of Section 6.3, the following applies:

(a) Should there be a net decrease in Company Minimum Gain in any taxable year, the Company shall specially allocate to each Member items of income and gain for that year (and, if necessary, for subsequent years) as required by the Regulations governing "minimum gain chargeback" requirements, section 1.704-2(f) [26 C.F.R. § 1.704-2(f)], prior to making any other allocations.

(b) Should there be a net decrease in Company Minimum Gain based on a Member Nonrecourse Debt in any taxable year, the Company shall first determine the extent of each Member's share of the Company Minimum Gain attributable to Member Nonrecourse Debt in accordance with Regulations section 1.704-2(i)(5) [26 C.F.R. § 1.704-2(i)(5)]. The Company shall then specially allocate items of income and gain for that year (and, if necessary, for subsequent years) in accordance with Regulations section 1.704-2(i)(4) [26 C.F.R. § 1.704-2(i)(4)] to each Member who has a share of the Company Nonrecourse Debt Minimum Gain.

(c) The Company shall allocate nonrecourse deductions for any taxable year to each Member in proportion to his or her Percentage Interest.

(d) The Company shall allocate Member Nonrecourse Deductions for any taxable year to the Member who bears the risk of loss with respect to the nonrecourse debt to which the Member Nonrecourse Deduction is attributable, as provided in Regulations section 1.704-2(i) [26 C.F.R. § 1.704-2(i)].

(e) If a Member unexpectedly receives any allocation of loss or deduction, or item thereof, or distributions which result in the Member's having a Negative Capital Account balance at the end of the taxable year greater than the Member's share of Company Minimum Gain, the Company shall specially allocate items of income and gain to that Member in a manner designed to eliminate the excess Negative Capital Account balance as rapidly as possible. Any allocations made in accordance with this provision shall be taken into consideration in determining subsequent allocations under this Article, so that, to the extent possible, the total amount allocated in this and subsequent allocations equals that which would have been allocated had there been no unexpected adjustments, allocations, and distributions and no allocation pursuant to Section 6.4(e).

(f) In accordance with Code section 704(c) [26 U.S.C.A. § 704(c)] and the Regulations promulgated pursuant thereto, and notwithstanding any other provision in this Article, income, gain, loss, and deductions with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among Members taking into account any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this subsection are made solely for federal, state, and local taxes and shall not be taken into consideration in determining a Member's Capital Account or share of Net Profits or Net Losses or any other items subject to Distribution under this Agreement.

Section 6.5. Distributions.

The Members may elect, by unanimous vote, to cause the Company to make a Distribution of assets at any time that would not be prohibited under the Act or this Agreement. Such a Distribution shall be made in proportion to the unreturned capital contributions of each Member until all contributions have been paid, and thereafter in proportion to each Member's Percentage Interest in the Company.

Section 6.6. Members Bound by These Provisions.

The Members understand and acknowledge the tax ramifications of the provisions of this Article and agree to be bound by these provisions in reporting items of income and loss relating to the Company on their federal and state income tax returns.

## ARTICLE VII.
### TRANSFERS AND TERMINATIONS OF MEMBERSHIP INTERESTS

Section 7.1. Restriction on Transferability of Membership Interests.

A Member may not transfer, assign, encumber, or convey all or any part of his or her Membership interest in the Company, except as provided herein. In entering into this Agreement, each of the Members acknowledges the reasonableness of this restriction, which is intended to further the purposes of the Company and the relationships among the Members.

Section 7.2. Permitted Transfers.

In order to be permitted, a transfer or assignment of all or any part of a Membership interest must have the approval of all of the Members of the Company. Each Member, in his or her sole discretion, may proffer or withhold approval. In addition, the following conditions must be met:

(a) the transferee must provide a written agreement, satisfactory to the Members, to be bound by all of the provisions of this Agreement;

(b) the transferee must provide the Company with his or her taxpayer identification number and initial tax basis in the transferred interest;

(c) the transferee must pay the reasonable expenses incurred in connection with his or her admission to Membership;

(d) the transfer must not result in the termination of the Company pursuant to Code section 708 [26 U.S.C.A. § 708];

(e) the transfer must not render the Company subject to the Investment Company Act of 1940, as amended [15 U.S.C.A. §§ 80a-1 et seq.]; and

(f) the transferor must comply with the provisions of Section 7.3.

Section 7.3. Company's Right to Purchase Transferor's Interest.

Any Member who wishes to transfer all or any part of his or her interest in the Company shall immediately provide the Company with written notice of his or her intention. The notice shall fully describe the nature of the interest to be transferred. Thereafter, the Company, or its nominee, shall have the option to purchase the transferor's interest at a price equal to the amount that the transferor would receive if the Company were liquidated as of the date of the proposed transfer and an amount equal to the book value of the Company was available for distribution to the Members, in accordance with Section 9.3.

(a) The option provided to the Company shall be irrevocable and shall remain open for thirty (30) days from the date that notice is given, except that if notice is given by regular mail, the option shall remain open for thirty-five (35) days from the date that notice is given to the Company.

(b) At any time while the option remains open, the Company may elect to exercise the option and purchase the transferor's interest in the Company. The transferor Member shall not vote on the question of whether the Company should exercise its option.

(c) If the Company chooses to exercise its option to purchase the transferor's interest, it shall provide written notice to the transferor within the option period. The notice shall specify a closing date for the purchase, which shall occur within thirty (30) days of the expiration of the option period. On the closing date, the transferor shall be paid in cash the purchase price and shall deliver an instrument of title, unencumbered and containing warranties of title, conveying his or her interest in the Company.

(d) If the Company declines to exercise its option to purchase the transferor Member's interest, the transferor Member may then transfer his or her interest in accordance with Section 7.2.

Section 7.4. Transfers Not in Compliance with This Agreement.

13

Any transfer not in compliance with the provisions of Sections 7.2 and 7.3 or any other provision of this Agreement shall be null and void and have no force or effect.

### Section 7.5. Occurrence of Dissolution Event.

Upon the death, withdrawal, resignation, retirement, expulsion, insanity, bankruptcy, or dissolution of any Member (a Dissolution Event), the Company shall be dissolved, unless all of the Remaining Members elect unanimously within ninety (90) days thereafter to continue the operation of the business. In the event that the Remaining Members so agree, the Company and the Remaining Members shall have the right to purchase the interest of the Member whose actions caused the occurrence of the Dissolution Event. The interest shall be sold in the manner described in Section 7.6.

### Section 7.6. Withdrawal from Membership.

Notwithstanding Section 7.4, in the event that a Member withdraws in accordance with Section 4.3, and the withdrawal does not result in the dissolution of the Company, the Company and the Remaining Members shall have the right to purchase the interest of the withdrawing Member in the manner described in Section 7.5.

### Section 7.7. Purchase of Interest of Departing Member.

The purchase price of a Departing Member's interest shall be determined in accordance with the procedure provided in Section 7.3.

(a) Once a value has been determined, each Remaining Member shall be entitled to purchase that portion of the Departing Member's interest that corresponds to his or her percentage ownership of the Percentage Interest of those Members electing to purchase a portion of the Departing Member's interest in the Company.

(b) Each Remaining Member desiring to purchase a share of the Departing Member's interest shall have thirty (30) days to provide written notice to the Company of his or her intention to do so. The failure to provide notice shall be deemed a rejection of the opportunity to purchase the departing Member's interest.

(c) If any Member elects not to purchase all of the Departing Member's interest to which he or she is entitled, the other Members may purchase that portion of the Departing Member's interest. Any interest which is not purchased by the Remaining Members may be purchased by the Company.

(d) The Company shall assign a closing date within sixty (60) days after the Member's election to purchase is completed. At that time, the Departing Member shall deliver to the Company and the Remaining Members an instrument of title, free of any encumbrances and containing warranties of title, duly conveying his or her interest in the Company and, in return, he or she shall be paid the purchase price for his or her interest

14

in cash. The Departing Member, the Company, and the Remaining Members shall perform all acts reasonably necessary to consummate the transaction in accordance with this Agreement.

Section 7.8. No Release of Liability.

Any Member or Departing Member whose interest in the Company is sold pursuant to Article VII is not relieved thereby of any liability he or she may owe the Company.

## ARTICLE VIII.
## BOOKS, RECORDS, AND REPORTING

Section 8.1. Books and Records.

The Company shall maintain at its principal place of business the following books and records:

(a) a current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the Capital Contribution, Capital Account, and Membership Interest of each Member;

(b) a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) a copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) the books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) true and correct copies of all relevant documents and records indicating the amount, cost, and value of all of the property and assets of the Company.

Section 8.2. Accounting Methods.

The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

15

Section 8.3. Reports.

The Company shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency. The Company shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal and state tax returns. The Company shall send to each Member within ninety (90) days of the conclusion of the taxable year:

(a) all information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns; and

(b) a copy of the Company's federal, state, and local income tax or information returns for the taxable year.

Section 8.4. Inspection Rights.

For purposes reasonably related to their interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. The Company shall provide Members with copies of all records and documents to which Members are entitled under Corp. Code § 17106(a).

Section 8.5. Bank Accounts.

The Members shall maintain all of the funds of the Company in a bank account or accounts in the name of the Company, at a depository institution or institutions. The Members shall not permit the funds of the Company to be commingled in any manner with the funds or accounts of any other Person. Any Member may endorse checks, drafts, or other evidence of indebtedness to the Company for the sole purpose of depositing them in the Company accounts. No Member, acting alone, may sign checks, drafts, or other evidence of indebtedness obligating the Company to pay money to a third party. All checks, drafts, and other evidence of indebtedness must be executed on behalf of the Company by the Managing Member.

Section 8.6. Tax Matters Member (Tax Matters Partner)

The Company designates Suneet Singal as Tax Matters Member (Tax Matters Partner), as defined in Code section 6231(a)(7) [26 U.S.C.A. § 6231(a)(7)], to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities and to expend Company monies to obtain necessary professional services in connection with such examinations.

*16*

## ARTICLE IX
## DISSOLUTION, LIQUIDATION, AND WINDING UP

Section 9.1. Conditions Under Which Dissolution Shall Occur.

The Company shall dissolve and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) at the time specified in the Articles;

(b) upon the happening of a Dissolution Event, and the failure of the Remaining Members to elect to continue, in accordance with Section 7.4;

(c) upon the vote of all of the Members to dissolve;

(d) upon the entry of a decree of judicial dissolution pursuant to Corp. Code § 17351;

(e) upon the happening of any event specified in the Articles as causing or requiring dissolution; or

(f) upon the sale of all or substantially all of the Company's assets.

Section 9.2. Winding Up and Dissolution.

If the Company is dissolved, the Remaining Members shall wind up its affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's creditors of the commencement of dissolution proceedings.

Section 9.3. Order of Payment.

After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members who are creditors of the Company, the remaining assets shall be distributed among the Members in accordance with their Positive Capital Account balances, after taking into consideration the profit and loss allocations made pursuant to Section 6.4. Members shall not be required to restore Negative Capital Account Balances.

Section 9.4. Members' Receipt of Payment.

Except as otherwise provided in this Agreement or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Net Profits from any individual Member, except as provided in Article X.

Section 9.5. Filing of Certificates.

Upon the dissolution of the Company, the Company shall file a Certificate of Dissolution with the Secretary of State. After the winding up of the Company's affairs has been completed, the Company shall file a Certificate of Cancellation of the Articles of Organization with the Secretary of State.

## ARTICLE X.
## INDEMNIFICATION OF AGENTS

The Company shall indemnify any Member and may indemnify any Person to the fullest extent permitted by law on the date such indemnification is requested for any judgments, settlements, penalties, fines, or expenses of any kind incurred as a result of that Person's performance in the capacity of Member, manager, officer, employee, or agent of the Company, as long as the Member or Person did not behave in violation of Section 5.6.

## ARTICLE XI.
## MISCELLANEOUS PROVISIONS

Section 11.1. Assurances.

Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the other Members and the Company or required by this Agreement or the Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

Section 11.2. Complete Agreement.

This Agreement and the Articles constitute the complete and exclusive statement of the agreement among the Members with respect to the matters discussed herein and therein and they supersede all prior written or oral statements among the Members, including any prior statement, warranty, or representation.

Section 11.3. Section Headings.

The section headings which appear throughout this Agreement are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

Section 11.4. Binding Effect.

Subject to the provisions of this Agreement relating to the transferability of Membership interests, this Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

Section 11.5. Interpretation.

All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member or his or her counsel.

Section 11.6. Company Counsel.

Company counsel may also be counsel to any Member or Affiliate of a Member, if a majority of the Members who are not individually represented by such counsel agree. The Members may execute on behalf of the Members and the Company any written consents to such representation as may be required by the California Rules of Professional Conduct or the rules governing professional conduct in other jurisdictions. Randall S. Davis of Davis & Brown, LLP has been initially selected to serve as Company counsel. The Members acknowledge and agree that Company counsel owes them no direct duties and that Company counsel's duties shall be owed to the Company and to any Member or Affiliate of a Member which he or she represents individually.

Section 11.7. Applicable Law.

Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not by the law of conflicts, of the State of California.

Section 11.8. Jurisdiction and Venue.

Each Member agrees to submit to the exclusive jurisdiction of the federal and state courts of the State of California in any action arising out of a dispute under or in connection with this Agreement or any transaction contemplated by this Agreement. Each Member further agrees that personal jurisdiction may be effected upon him or her by service of process by registered or certified mail addressed as provided in Exhibit A attached hereto, and that when service is so made, it shall be as if personal service were effected within the State of California.

Section 11.9. Specific Performance.

The Members acknowledge and agree that irreparable injury shall result from a breach of this Agreement and that money damages will not adequately compensate the injured party. Accordingly, in the event of a breach or a threatened breach of this Agreement, any party who may be injured shall be entitled, in addition to any other remedy which may be available, to injunctive relief to prevent or to correct the breach.

Section 11.10. Arbitration.

Except as otherwise provided in this Agreement, any dispute arising out of this Agreement shall be submitted to the American Arbitration Association for resolution. The arbitration shall be scheduled to take place in County of Sacramento, State of California, and all of the fees and costs of the arbitration shall be shared equally by the parties. Attorney fees may be awarded to the prevailing party at the discretion of the arbitrator, but the arbitrator shall have no power to alter or amend this Agreement or to award any relief inconsistent with the provisions herein or unavailable in a court of law.

\\\\

Section 11.11. Remedies Cumulative.

The remedies described in this Agreement are cumulative and shall not eliminate any other remedy to which a Person may be lawfully entitled.

Section 11.12. Notices.

Any notice or other writing to be served upon the Company or any Member thereof in connection with this Agreement shall be in writing and shall be deemed completed when delivered to the address specified in Exhibit A, if to a Member, and to the resident agent, if to the Company. Any Member shall have the right to change the address at which notices shall be served upon ten (10) days' written notice to the Company and the other Members.

Section 11.13. Amendments.

Any amendments, modifications, or alterations to this Agreement or to the Articles must be in writing and signed by all of the Members.

Section 11.14. Severability.

Each provision of this Agreement is severable from the other provisions. If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of this Agreement, which shall continue in full force and effect.

Section 11.15. Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document.

Section 11.16. Spousal Consent.

Within ten (10) days of becoming a Member of the Company or ten (10) days after an

individual marries, such Member shall have his or her spouse execute consent in the same or similar form as the one attached to this Agreement.

\\\

\\\

\\\\

IN WITNESS WHEREOF, all of the Members of First Capital Real Estate Investments, LLC, A California Limited Liability Company, have executed or caused to be executed this Agreement, effective as of the date set forth at the commencement of the document.

_____

Managing Member
Suneet Singal

21

EXHIBIT A
MEMBERS OF FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC
AS OF March 13th, 2008

| NAME | ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|------|---------|----------------------|---------------------|
| Managing Member Suneet Singal | 101 Barnhart Circle Sacramento CA 95835 | $25,000 | 100% |

22

## EXHIBIT C

### Certificate of Existence and Good Standing

The Certificate of Existence and Good Standing of FCREI follow this cover page.

# State of California
## Secretary of State

### CERTIFICATE OF STATUS

**ENTITY NAME:**   FIRST CAPITAL REAL ESTATE INVESTMENTS LLC

**FILE NUMBER:**         200803610181
**FORMATION DATE:**   02/05/2008
**TYPE:**                       DOMESTIC LIMITED LIABILITY COMPANY
**JURISDICTION:**        CALIFORNIA
**STATUS:**                  ACTIVE (GOOD STANDING)

I, ALEX PADILLA, Secretary of State of the State of California, hereby certify:

The records of this office indicate the entity is authorized to exercise all of its powers, rights and privileges in the State of California.

No information is available from this office regarding the financial condition, business activities or practices of the entity.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of December 16, 2015.

**ALEX PADILLA**
Secretary of State

*NP-25 (REV 01/2015)*

RKS

**EXHIBIT D**

**Articles of Organization**

The Articles of Organization of Borrower follows this cover page.

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:14 PM 12/21/2015
FILED 12:14 PM 12/21/2015
SR 20151462260 - File Number 5913262

# CERTIFICATE OF FORMATION

## OF

### FIRST CAPITAL HOBBS, LLC

**FIRST:**      The name of the limited liability company is FIRST CAPITAL HOBBS, LLC

**SECOND:**      The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:**      Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

     **IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation, on December 16, 2015.

                     */s/William Zayac*
                     William Zayac, Authorized Person

**EXHIBIT E**

**Operating Agreement**

The Operating Agreement of Borrower follows this cover page.

LIMITED LIABILITY COMPANY AGREEMENT
OF
FIRST CAPITAL HOBBS, LLC

This Limited Liability Company Agreement (together with the schedules attached hereto, this "Agreement") of FIRST CAPITAL HOBBS, LLC, A Delaware limited liability company (the "Company"), is entered into by FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC, a California limited liability company, as the sole equity member (the "Member"), and SUNEET SINGAL, as the Special Member (as defined on Schedule A hereto). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

The Member, by execution of this Agreement, hereby forms the Company as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), and this Agreement, and the Member and the Special Member hereby agree as follows:

Section 1.     Name.

The name of the limited liability company formed hereby is FIRST CAPITAL HOBBS, LLC.

Section 2.     Principal Business Office.

The principal business office of the Company shall be located at 60 Broad Street, 34th Floor, New York, NY 10004 or such other location as may hereafter be determined by the Member.

Section 3.     Registered Office.

The address of the registered office of the Company in the State of Delaware is c/o Vcorp Services, LLC, 1811 Silverside Road, in the City of Wilmington, County of New Castle, Delaware 19801.

Section 4.     Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Vcorp Services, LLC, 1811 Silverside Road, in the City of Wilmington, County of New Castle, Delaware 19801.

Section 5.     Members.

(a)     The mailing address of the Member is set forth on Schedule B attached hereto. The Member was admitted to the Company as a member of the Company upon its execution of a counterpart signature page to this Agreement.

(b)     Subject to Section 9(d), the Member may act by written consent.

1

(c)     The Member shall at all times cause there to be a Person (other than the Member) bound by this Agreement as Special Member. Upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 21 and 23, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 22 and 23), the Special Member shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as a member and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member unless a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement; provided, however, the Special Member who is acting as a member of the Company shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member. The Special Member, while acting as a member of the Company, shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. A Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the Act, the Special Member, in its capacity as a member of the Company, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. The Special Member shall execute a counterpart to this Agreement. Prior to its admission to the Company as a member, the Special Member shall not be a member of the Company.

Section 6.     Certificates.

William Zayac is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, her powers as an "authorized person" ceased, and the Member thereupon became the designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act. The Member shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in Texas and in any other jurisdiction in which the Company may wish to conduct business.

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

Section 7.     Purpose.

(a)     Notwithstanding any provision hereof to the contrary, the following shall govern: The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

> (i)     To acquire a 100% interest in a mortgage note secured by a mortgage on that certain property located at 4630 Lovington Highway, Hobbs, New Mexico 88240 (the "Property");

> (ii)    To own, hold, sell, assign, transfer, operate, lease, mortgage, pledge and otherwise deal with the Property; and

> (iii)   to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes.

(b)     The Company is hereby authorized to execute, deliver and perform, and Suneet Singal, as authorized signatory on behalf of the Company is hereby authorized to execute and deliver, the Basic Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement. The foregoing authorization shall not be deemed a restriction on the powers of the Member to enter into other agreements on behalf of the Company.

Section 8.     Powers.

Subject to Section 9(d), the Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.     Management.

(a)     Subject to Section 9(d), the business and affairs of the Company shall be managed by or under the direction of the Member.

(b)     Powers. Subject to Section 9(d), the Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise. Subject to Sections 7 and 9, the Member has the authority to bind the Company.

(c)     Member as Agent. To the extent of its powers set forth in this Agreement and subject to Section 9(d), the Member is an agent of the Company for the purpose of the

3

Company's business, and the actions of the Member taken in accordance with such powers set forth in this Agreement shall bind the Company.

      (d)    <u>Limitations on the Company's Activities</u>.

          (i)    This <u>Section 9(d)</u> is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

          (ii)    The Member shall not, so long as any Obligation is outstanding, amend, alter, change or repeal the definition of "Special Member" or <u>Sections</u> 5(c), <u>7</u>, <u>8</u>, <u>9</u>, <u>16</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>24</u>, <u>25</u>, <u>26</u> or <u>31</u> or <u>Schedule A</u> of this Agreement unless the Rating Agency Condition is satisfied. Subject to this <u>Section 9(d)</u>, the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with <u>Section 31</u>.

          (iii)    Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member or any other Person, so long as any Obligation is outstanding, neither the Member nor any other Person shall be authorized or empowered on behalf of the Company to, nor shall they permit the Company to, and the Company shall not, without the prior unanimous written consent of the Member, take any Material Action.

          (iv)    Notwithstanding any provision hereof to the contrary and for so long as a mortgage lien exists on any portion of the Property, in favor of TCA Global Credit Master Fund, LP, a Cayman Islands limited partnership ("TCA"), the following shall govern:

              A.  The Company shall not incur, assume, or guaranty any indebtedness, other than the TCA loan.

              B.  The Company shall not consolidate or merge with or into any other entity or convey or transfer its properties and assets substantially as an entirety to any entity.

              C.  The Company will not voluntarily commence a case with respect to itself, as debtor, under the Federal Bankruptcy Code or any similar federal or state statute without the consent of the Member.

              D.  For so long as a mortgage lien exists on any portion of the Property, no material amendment to the certificate of formation or this Agreement may be made without first obtaining approval of the mortgagees holding first mortgages on any portion of the Property.

          (v)    Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary

and for so long as a mortgage lien exists on any portion of the Property, in order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Agreement, the Company shall conduct its affairs in accordance with the provisions set forth herein below. The Company shall, and the Member of the Company shall cause the Company to:

A. not own any asset or property other than (A) the Property, and (B) incidental personal property necessary for the development, ownership, management or operation of the Property;

B. not engage in any business or activity other than the acquisition, development, ownership, management and operation of the Property and conduct and operate its business as presently conducted and operated;

C. not enter into any contract or agreement with any affiliate of the Company, any constituent party of the Company or any affiliate of any constituent party, except upon terms and conditions that are intrinsically fair, commercially reasonable, and no less favorable to it than those that would be available on an arm's-length basis from an unrelated third party;

D. not incur any indebtedness other than (i) any debt evidenced by a first mortgage lien on the Property (the "Debt") and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding two percent (2%) of the original principal amount of the note evidencing the debt secured by the Property at any one time; provided that any indebtedness incurred pursuant to clause (ii) shall be (A) outstanding not more than sixty (60) days and (B) incurred in the ordinary course of business. No indebtedness, other than the Debt, may be secured (senior, subordinate or *pari passu*) by the Property;

E. not make any loans or advances to any other person (including any affiliate of the Company, any constituent party of the Company or any affiliate of any constituent party), and not acquire obligations or securities of its affiliates;

F. will do and cause to be done, all things necessary to observe its organizational formalities and preserve its existence;

G. will not terminate or fail to comply with the provisions of its organizational documents;

H. not amend, modify or otherwise change, its organizational documents;

5

I.  maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any other person and not permit its assets to be listed as assets on the financial statement of any other person;

J.  file its own tax returns (to the extent the Company was or is required to file any tax returns) and not file a consolidated federal income tax return with any other person;

K.  maintain its books, records, resolutions and agreements as official records;

L.  hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of the Company or any constituent party of the Company) and correct any known misunderstanding regarding its status as a separate entity;

M.  conduct business in its own name and not identify itself or any of its affiliates as a division or department or part of the other;

N.  maintain and utilize separate stationery, invoices and checks bearing its own name;

O.  intend to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

P.  not, nor shall any constituent party of the Company, seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of the Company, any sale or other transfer of all or substantially all of its assets or any sale or other transfer outside the ordinary course of business;

Q.  not commingle funds or other assets of the Company with those of any affiliate or constituent party or any other person, and has held and will hold all of its assets in its own name;

R.  maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party or any other person;

S.  not assume, guarantee or become obligated for the debts of any other person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other person;

6

T.  not permit any affiliate or constituent party (other than the Member) independent access to its bank accounts;

U.  intend to remain solvent and pay its own liabilities and expenses from its assets as the same shall become due to the extent Gross Income from Operations (as said term is defined in the Loan Agreement) is sufficient to pay such amounts, including the salaries of its own employees (if any) from its own funds, and maintain a sufficient number of employees (if any) in light of its contemplated business operations;

V.  compensate each of its consultants and agents from its funds for services provided to it and pay from its assets all obligations of any kind incurred;

W.  not, without the unanimous consent of all of its members, (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the Company or for all or any portion of the Company's assets or properties, (C) take any action that might cause such entity to become insolvent, (D) make any assignment for the benefit of the Company's creditors, (E) admit in writing such entity's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligations, or (G) take any action that might cause the Company to become insolvent;

X.  maintain an arm's-length relationship with its affiliates;

Y.  allocate fairly and reasonably for any overhead expenses that are shared with any affiliate, including shared personnel and shared office space;

Z.  not, except in connection with any loans made by any lender, (collectively, "Lender") to the Company (the "Loan"), pledge its assets or properties for the benefit of any other Person;

AA.  consider the interests of the Company's creditors in connection with all actions;

BB.  not, except in connection with the Loan, have any of its obligations guaranteed by any affiliate;

7

Failure of the Company, or the Member on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Member.

Section 10.    Intentionally Omitted.

Section 11.    Intentionally Omitted.

Section 12.    Limited Liability.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Member nor the Special Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Special Member of the Company.

Section 13.    Capital Contributions.

The Member has contributed to the Company property of an agreed value as listed on Schedule B attached hereto.  In accordance with Section 5(c), the Special Member shall not be required to make any capital contributions to the Company.

Section 14.    Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time upon the written consent of such Member.  To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise Schedule B of this Agreement. The provisions of this Agreement, including this Section 14, are intended to benefit the Member and the Special Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (other than a Covered Person) (and no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Member and the Special Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 15.    Allocation of Profits and Losses.

The Company's profits and losses shall be allocated to the Member.

Section 16.    Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any Basic Document.

Section 17.     Books and Records.

The Member shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.   The Member and its duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours.  The Company's books of account shall be kept using the method of accounting determined by the Member.  The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Member.

Section 18.     Intentionally Omitted.

Section 19.     Other Business.

Notwithstanding any duty otherwise existing at law or in equity, the Member and the Special Member and any Affiliate of the Member or the Special Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 20.     Exculpation and Indemnification.

(a)     To the fullest extent permitted by applicable law, neither the Member nor the Special Member nor any officer, director, employee, agent or Affiliate of the foregoing (collectively, the "Covered Persons") shall be liable to the Company or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 20 by the Company shall be provided out of and to the extent of Company assets only, and the Member and the Special Member shall not have personal liability on account thereof; and provided further, that so long as any Obligation is outstanding, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity under this Section 20 shall be payable from amounts allocable to any other Person pursuant to the Basic Documents.

(c)     To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 20.

(d)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)     The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(f)     The foregoing provisions of this Section 20 shall survive any termination of this Agreement.

Section 21.     Assignments.

The Member may assign in whole or in part its limited liability company interest in the Company.   Subject to Section 23, the transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 21, such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company.  Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation in compliance with the Basic Documents shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

Section 22.     Resignation.

So long as any Obligation is outstanding, the Member may not resign, except as permitted under the Basic Documents and if the Rating Agency Condition is satisfied.  If the Member is permitted to resign pursuant to this Section 22, an additional member of the Company shall be admitted to the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  Such admission shall be deemed effective immediately prior

to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 23.     Admission of Additional Members.

One or more additional Members of the Company may be admitted to the Company with the written consent of the Member; provided, however, that, notwithstanding the foregoing, so long as any Obligation remains outstanding, no additional Member may be admitted to the Company unless the Rating Agency Condition is satisfied.

Section 24.     Dissolution.

(a)     The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.  Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company or that causes the Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 21 and 23, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 22 and 23), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of such member in the Company.

(b)     Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or a Special Member that has been admitted to the Company as a member shall not cause the Member or Special Member, respectively, to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)     Notwithstanding any other provision of this Agreement, each of the Member and the Special Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or a Special Member that has been admitted to the Company as a member or the occurrence of an event that causes the Member or a Special Member to cease to be a member of the Company.

(d)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

11

(e)     The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 25.     Waiver of Partition; Nature of Interest.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member and the Special Member hereby irrevocably waives any right or power that such Person might have to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Section 16 hereof.  The interest of the Member in the Company is personal property.

Section 26.     Benefits of Agreement; No Third-Party Rights.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member or a Special Member.  Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Covered Persons).

Section 27.     Severability of Provisions.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 28.     Entire Agreement.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 29.     Binding Agreement.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, without limitation, Sections 7, 8, 9, 20, 21, 22, 23, 24, 26, 29 and 31, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member in accordance with its terms.

Section 30.     Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

12

Section 31.    Amendments.

Subject to Section 9(d), this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member. Notwithstanding anything to the contrary in this Agreement, so long as any Obligation is outstanding, this Agreement may not be modified, altered, supplemented or amended unless the Rating Agency Condition is satisfied except: (i) to cure any ambiguity or (ii) to convert or supplement any provision in a manner consistent with the intent of this Agreement and the other Basic Documents.

Section 32.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 33.    Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 2, (b) in the case of the Member, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 34.    Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation with the Office of the Delaware Secretary of State on December 21, 2015.

[SIGNATURE PAGE FOLLOWS]

13

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the 30ᵗʰ day of December, 2015.

MEMBER:

FIRST CAPITAL REAL ESTATE
INVESTMENTS, LLC,
a California limited liability company

By: _____
    Name:
    Title:

SPECIAL MEMBER:

_____
Name: Suneet Singal

S-1

SCHEDULE A

Definitions

A.    Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Affiliate" means, with respect to any Person, any other person that (i) directly or indirectly, owns ten percent (10%) or more of legal, beneficial or economic interests in such person, (ii) is in control of, is controlled by or is under common ownership or control with such person, (iii) is a director or officer of such person or of an affiliate of such Person and/or (iv) is the spouse, issue or parent of such person or of an affiliate of such person.

"Agreement" means this Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Bankruptcy" means, with respect to any Person, (A) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (B) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"Basic Documents" means the Loan Agreement and Senior Secured Credit Facility made by and between the Company or First Capital Real Estate Investments, LLC (as applicable) and Lender with respect to the Loan (the "Loan Agreement"); and all documents and certificates contemplated thereby or delivered in connection therewith.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on December 21, 2015, as amended or amended and restated from time to time.

"Company" means First Capital Hobbs, LLC, a Delaware limited liability company.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings.  Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"Covered Persons" has the meaning set forth in Section 20(a).

"Material Action" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a voluntary bankruptcy petition or any other petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

"Member" means First Capital Real Estate Investments, LLC, as the initial member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include the Special Member.

"Obligation" shall mean the indebtedness, liabilities and obligations of the Company under or in connection with the Basic Documents or any related document in effect as of any date of determination.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, estate, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Rating Agency" has the meaning assigned to that term in the Basic Documents.

"Rating Agency Condition" means (i) with respect to any action taken at any time before the Loan evidenced and secured by the Basic Documents has been sold or assigned to a securitization trust, that the Lender thereunder has consented in writing to such action, and (ii) with respect to any action taken at any time after the Loan has been sold or assigned to a securitization trust, that each Rating Agency shall have been given ten days prior notice thereof and that each of the Rating Agencies shall have notified the Company in writing that such action will not result in a reduction or withdrawal of the then current rating by such Rating Agency of any of securities issued by such securitization trust.

"Special Member" means a Person bound by this Agreement as a Special Member, who may be admitted to the Company as a member of the Company pursuant to Section 5(c).  A Special Member shall only have the rights and duties expressly set forth in this Agreement.

B.      Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision.  The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

SCHEDULE B

<u>Member</u>

| <u>Name</u> | <u>Mailing Address</u> | <u>Limited Liability Company Interest</u> |
|---|---|---|
| First Capital Real Estate Investments, LLC | 2377 Gold Meadow Way, Suite 290 Gold River, CA 95670 | 100% |

**EXHIBIT F**

**Certificate of Existence and Good Standing**


The Certificate of Existence and Good Standing of Borrower follow this cover page.



# Delaware

The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "FIRST CAPITAL HOBBS, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-NINTH DAY OF DECEMBER, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "FIRST CAPITAL HOBBS, LLC" WAS FORMED ON THE TWENTY-FIRST DAY OF DECEMBER, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

5913262   8300

SR# 20151560051

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 10696553

Date: 12-29-15

## EXHIBIT G

## RESOLUTIONS OF FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC

WHEREAS, **FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC,** a California limited liability company ("**FCREI**") is the sole member of **FIRST CAPITAL HOBBS, LLC,** a Delaware limited liability company ("**Borrower**"); and

WHEREAS, Borrower desires to enter into a financing arrangement with **HEARTLAND BANK,** an Arkansas state bank (the "**Lender**") for the purpose of borrowing from Lender the principal amount of $5,897,626.36 (the "**Loan**"); and

WHEREAS, FCREI desires to guaranty the Loan, which guaranty shall be evidenced by a Guaranty Agreement (the "**Guaranty**"); and

WHEREAS, the Loan will be evidenced by a Credit Agreement (Term Loan) executed by and between Borrower and Lender (the "**Credit Agreement**"), and a Promissory Note (Term Loan) in the amount of $5,897,626.36 executed by Borrower and payable to the order of Lender, and will be secured, in part, by a Security Agreement executed by Borrower for the benefit of Lender and by an Assignment of Note and Lien executed by Borrower for the benefit of Lender (such Credit Agreement, Promissory Note, Security Agreement, Assignment of Note and Lien, Guaranty, and all other documents executed in connection therewith are hereafter collectively referred to as the "**Loan Documents**"); and

WHEREAS, the Loan Documents have been submitted to and reviewed by FCREI and by Borrower, pursuant to the Operating Agreements of FCREI and of Borrower; NOW, THEREFORE, BE IT

RESOLVED, that in the judgment of the governing authority of Borrower, the execution and delivery of the Loan Documents may reasonably be expected to benefit Borrower; and

FURTHER RESOLVED, that the form, terms and provisions of the Loan Documents, including all exhibits, schedules and attachments thereto, are hereby approved in all respects, and the execution and delivery thereof, and the performance thereunder by Borrower are hereby authorized, approved and directed; and

FURTHER RESOLVED, that the Managing Member of FCREI hereby is, authorized, empowered and directed to execute the Loan Documents on its own behalf and on behalf of FCREI in its capacity as sole member of Borrower, with such changes in the terms and provisions thereof as he shall, in his sole discretion, deem necessary or desirable and in the best interest of Borrower, his signature being conclusive evidence that he did so deem any such changes to be necessary or desirable and in the best interest of Borrower; and

FURTHER RESOLVED, that the Managing Member of FCREI hereby is, authorized, empowered and directed to perform all acts and to do all things which he may deem necessary or desirable to cause FCREI and to cause Borrower to consummate the transactions contemplated by the Loan Documents, with such modifications, amendments or future agreements as he shall, in his sole discretion, deem necessary or desirable and in the best interest of FCREI and of Borrower, his performance of any acts for and on behalf and in the name of FCREI on its own

behalf and in its capacity as sole member of Borrower to be conclusive evidence that he did so deem such to be necessary or desirable; and

FURTHER RESOLVED, the Managing Member of FCREI hereby is, authorized and directed to cause FCREI on its own behalf and in its capacity as sole member of Borrower to execute and deliver all other documents, instruments and agreements, to waive any or all conditions, and to do all things necessary or helpful to carry out the purposes of the foregoing resolutions, and all acts and deeds of the Managing Member of FCREI which are consistent with the purposes and intent of the foregoing resolutions shall be, and the same hereby are, in all respects ratified, approved, confirmed and adopted as the acts and deeds of FCREI and of Borrower, as applicable, and the execution and delivery of any such documents, or the waiver of such conditions, and the doing and performance of such acts and deeds shall be conclusive evidence that he deemed such execution and delivery, such waiver or such action to be consistent with the purpose and intent of these resolutions; and

FURTHER RESOLVED, the Managing Member of FCREI hereby is, authorized and directed to cause FCREI and to cause Borrower to certify and attest any documents, instruments and agreements which he may deem necessary or appropriate to consummate the transactions contemplated by the Loan Documents, but such certification or attestation shall not be required for the validity of the particular document, instrument or agreement.