## PLEDGE AND SECURITY AGREEMENT

THIS **PLEDGE AND SECURITY AGREEMENT** is entered into as of November 2, 2016 by and between **First Capital Real Estate Advisors, LP** ("*Grantor*") and **HEARTLAND BANK, AN ARKANSAS STATE BANK** ("*Lender*"), on behalf of its Affiliates, loan participants and assigns ("*Secured Party*").

## R E C I T A L S

*WHEREAS*, on or about December 30, 2015, Lender made certain loans (the "**Loans**") to the following subsidiaries of First Capital Real Estate Investments, LLC ("**FCREI**"): to First Capital Victoria, LLC a loan in the amount of $4,394,227.15, to First Capital Hobbs, LLC a loan in the amount of $5,897,626.36 and to First Capital Jourdanton, LLC a loan in the amount of $5,038,500.00 (First Capital Victoria, LLC, First Capital Hobbs, LLC and First Capital Jourdanton, LLC herein referred to as the "**Borrowers**");

WHEREAS, the Loans are secured in part by the guaranty of FCREI; and

WHEREAS, Grantor, an affiliate of FCREI, is entering into this Pledge and Security Agreement (as it may be amended, restated or modified from time to time, this "*Agreement*") in order to, among other things, provide additional security for the Loans.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.  **DEFINITIONS**

    1.1.    **Reference to Pledge Agreement**. Unless otherwise specified, all references herein to Articles, Sections, Preliminary Statements, Exhibits, and Schedules refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, this Agreement. All Exhibits and Schedules shall be deemed a part of this Agreement. All Schedules include amendments and supplements thereto from time to time.

    1.2.    **Principles of Construction**. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neutral, as the context indicates is appropriate. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". All references to agreements and other contractual instruments shall be deemed to include subsequent amendments, permitted assignments and other modifications thereto, but only to the extent such amendments, assignments and other modifications are not prohibited by the terms of any Loan Document. Furthermore, any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

Exhibit 29

    1.3.    **Definitions**.  Unless otherwise defined herein, or the context hereof otherwise requires, each term defined in either of the Notes or in the UCC is used in this Agreement with the same meaning; *provided that*, if the definition given to such term in the Notes conflicts with the definition given to such term in the UCC, the Notes definition shall control to the extent legally allowable; and if any definition given to such term in Article 9 of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the Article 9 definition shall prevail. All definitions herein shall be equally applicable to both the singular and plural forms of the defined terms.  As used herein, the following terms have the meanings indicated:

    "*Collateral*" shall have the meaning set forth in **Section 2.1**.

    "*Control*" shall have the meaning set forth in *Section 9-314* of the UCC.

    "*Grantor*" has the meaning set forth in the introductory paragraph of this Agreement and includes Grantor' successors and assigns.

    "*Instrument*" means any "*instrument*", as such term is defined in *Section 9.102(a)(47)* of the UCC.

    "*Loan Documents*" means any of the notes, security agreements, mortgages, deeds of trust, credit agreements and other certificates, agreements and instruments relating to the Loans.

    "*Material Adverse Event*" means an event that would prevent Grantor from performing its duties under this Agreement.

    "*Obligations*" means all obligations, indebtedness, and liabilities of Borrowers any other obligated party to Lender or any Affiliate of Lender, or both, now existing or hereafter arising, whether direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, under, arising out of or otherwise relating to, the Loans, this Agreement or any other Loan Documents, any cash management or treasury services agreements and all interest accruing thereon (whether a claim for post-filing or post-petition interest is allowed in any bankruptcy, insolvency, reorganization or similar proceeding) and all attorneys' fees and other expenses incurred in the enforcement or collection thereof.

    "*Pledged Contract Rights and Receivables*" means all right, title and interest, present or future, of the Grantor, to, under and in respect of the right to receive any and all fees and other amounts due and payable to Debtor, including but not limited to any and all Acquisition Fees, Acquisition Expenses, Real Estate Disposition Commissions, Asset Management Fees, Financing Coordination Fees, any and all subordinated shares of excess cash flows, as applicable and Oversight Fees, due to Debtor, pursuant to that certain Advisory Agreement dated August 15, 2012, by and between First Capital Real Estate Trust Incorporated (f/k/a United Realty Trust Incorporated), a Maryland corporation, and any successor in interest, and First Capital Real Estate Operating Partnership, LP (f/k/a United Realty Capital Operating Partnership, L.P.), a Delaware limited partnership and the Grantor.

"*Proceeds*" means any "*proceeds*," as such term is defined in *Section 9-102(a)(64)* of the UCC, and, in any event, shall include, but not be limited to, (a) any and all income, fees, and distributions with respect to any of the Pledged Contract Rights and Receivables, (b) proceeds of any insurance, indemnity, warranty, or guaranty payable to Grantor from time to time with respect to any of the Pledged Contract Rights and Receivables, (c) any and all payments (in any form whatsoever) made or due and payable to Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Pledged Contract Rights and Receivables by any Governmental Authority (or any person acting under color of Governmental Authority), and (d) any and all other amounts from time to time paid or payable under or in connection with any of the Pledged Contract Rights and Receivables.

"*Section*" means a numbered Section of this Agreement, unless another document is specifically referenced.

"*Secured Obligations*" means the Obligations, whether or not (a) such Obligations arise or accrue before or after the filing by or against Grantor of a petition under the Bankruptcy Code, or any similar filing by or against Grantor under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (b) such Obligations are allowable under *Section 502(b)(2)* of the Bankruptcy Code or under any other insolvency proceedings, (c) the right of payment in respect of such Obligations is reduced to judgment, or (d) such Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.

"*Security*" has the meaning set forth in *Section 8-102(a)(15)* of the UCC.

"*Security Interests*" means the pledge and security interests securing the Secured Obligations, including (a) the pledge and security interest in the Collateral granted in this Agreement, and (b) all other security interests created or assigned as additional security for the Secured Obligations pursuant to the provisions of this Agreement.

"*Specified Stock Rights*" means any equity interests, securities, dividends or other distributions and any other right or property, whether or not considered a security, which Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for the Pledged Contract Rights and Receivables.

"*UCC*" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Arkansas; provided, however, that in any event, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority (or terms of similar import in any applicable jurisdiction) of Secured Party's Security Interest in any Collateral is governed by the UCC (or other similar law) as in effect in a jurisdiction (whether within or outside the United States) other than the State of Arkansas, the term "UCC" shall mean the Uniform Commercial Code (or other similar law) as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions.

2.      **GRANT OF SECURITY INTEREST**

    2.1.      **Grant of Security Interest**.

        (a)      As collateral security for the Secured Obligations, (i) Grantor hereby pledges and grants to Secured Party (including its Affiliates), a first priority Lien on and security interest in and to, and agrees and acknowledges that Secured Party has and shall continue to have, a Security Interest in and to, all of Grantor' right, title and interest in and to the Pledged Contract Rights and Receivables and all Proceeds of the Pledged Contract Rights and Receivables; and (ii) Borrower hereby pledges and grants to Secured Party (including its Affiliates), a first priority Lien on and security interest in and to, and agrees and acknowledges that Secured Party has and shall continue to have, a Security Interest in and to, all of Borrower's right, title and interest in and to the property described on Exhibit A (all of the property being described in the preceding clauses (i) and (ii) the "*Collateral*"), whether now owned or hereafter acquired, wherever located, howsoever arising or created and whether now existing or hereafter arising, existing or created.

        (b)      The Security Interests are granted as security only and shall not subject Secured Party or any holder of the Secured Obligations to, or transfer or in any way modify, any Obligations or liability of Grantor with respect to any of the Collateral.

    2.2.      **Grantor Remain Liable**.  Notwithstanding anything to the contrary contained herein, (a) Grantor shall remain liable under the contracts and agreements included in the Collateral, to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Grantor from any of their duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligations or liability under any of the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

    2.3.      **Authorization to File Financing Statements**.  Grantor hereby irrevocably authorize Secured Party at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that describe the Collateral and contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether Grantor are an organization, the type of organization and any organization identification number issued to Grantor.  Grantor agree to furnish any such information to Secured Party promptly upon request.

3.      **REPRESENTATIONS AND WARRANTIES**.  Grantor represents and warrants to Secured Party that:

    3.1.      **Title, Authorization, Validity and Enforceability**.  Grantor has good and valid rights in and title to the Collateral with respect to which it has purported to grant a Security Interest hereunder, free and clear of all other Liens, and has full power and authority to grant to

Secured Party the Security Interest in such Collateral pursuant hereto.  The execution and delivery by Grantor of this Agreement is duly authorized, and this Agreement constitutes a legal, valid and binding obligation of Grantor and creates a Security Interest which is enforceable against Grantor in all now owned and hereafter acquired Collateral.  When financing statements have been filed in the appropriate offices against Grantor in the locations listed on *Exhibit B*, Secured Party will have a fully perfected first priority Security Interest in that Collateral in which a Security Interest may be perfected by filing, subject to no other Liens.

3.2.    **Conflicting Laws and Contracts**.  Neither the execution and delivery by Grantor of this Agreement, the creation and perfection of the Security Interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Grantor or Grantor' articles or certificate of incorporation, bylaws, articles of organization or operating agreement or other charter documents, as the case may be, the provisions of any indenture, instrument or agreement to which Grantor are a party or are subject, or by which they, or their property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any Lien pursuant to the terms of any such indenture, instrument or agreement (other than any Lien of Secured Party).

3.3.    **Reserved**.

3.4.    **Litigation**.  There is no litigation investigation or governmental proceeding threatened against Grantor or any of their properties which would reasonably be expected to result in a Material Adverse Event with respect to the Collateral or Grantor.

3.5.    **No Other Names**.  Grantor has not conducted business under any name except the name in which it has executed this Agreement.

3.6.    **No Default or Event of Default**.  No Default or Event of Default has occurred.

3.7.    **No Financing Statements**.  No financing statement describing all or any portion of the Collateral which has not lapsed or been terminated naming Grantor as debtors has been filed in any jurisdiction except (a) financing statements naming Secured Party as the secured party, and (b) as permitted by *Section 4.1(d)*.

3.8.    **Pledged Equity Interests**.  *Exhibit A* sets forth a true, correct, and complete list of the Pledged Contract Rights and Receivables.  Grantor is the direct and beneficial owner of the Pledged Contract Rights and Receivables  free and clear of any Liens, except for the security interest granted to Secured Party hereunder.  Grantor further represents and warrants that (a) all Pledged Contract Rights and Receivables are duly and validly issued, are fully paid and non-assessable and (b) while the Pledged Contract Rights and Receivables are certificated pursuant to the terms of the LLC Agreements of Retail, Builders or Management they are not Securities as defined in Article 8 of the UCC of the applicable jurisdiction and Grantor will provide Lender with advance written notice if Retail, Builders or Management ever elects to be governed by the provisions of Article 8 of the UCC and immediately deliver to Lender any and all certificates issued to represent such securities.

4.     **COVENANTS**.  From the date of this Agreement, and thereafter until this Agreement is terminated:

    4.1.     **General**.

        (a)     **Inspection**.  Grantor will permit Secured Party, by its representatives and agents (i) to inspect the Collateral, (ii) to examine and make copies of the records of Grantor relating to the Collateral and (iii) to discuss the Collateral and the related records of Grantor with, and to be advised as to the same by, Grantor' officers, employees, and accountants all at such reasonable times and intervals as Secured Party may determine, and all at Grantor' expense.

        (b)     **Taxes**.  Grantor will pay when due all taxes, assessments and governmental charges and levies upon the Collateral, except those which are being contested in good faith by appropriate proceedings and with respect to which no Lien exists and as to which appropriate reserves are being maintained.

        (c)     **Records and Reports; Notification of a Default and Event of Default**. Grantor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Secured Party such reports relating to the Collateral at such intervals as Secured Party shall from time to time reasonably request.  Grantor will, upon becoming aware thereof, give prompt notice in writing to Secured Party of the occurrence of any Default or Event of Default and of any other development, financial or otherwise, which would reasonably be expected to materially and adversely affect the Collateral. Grantor shall mark their books and records to reflect the Security Interest of Secured Party under this Agreement.

        (d)     **Financing Statements and Other Actions; Defense of Title**.  Grantor will deliver to Secured Party all financing statements and deliver to the Secured Party the originals of all certificates evidencing any of the Pledged Contract Rights and Receivables and take such other actions as may from time to time be reasonably requested by Secured Party in order to maintain a first perfected Security Interest in the Collateral and/or to otherwise enable the Secured Party to enjoy its interest, rights and remedies under this Agreement.  Grantor will take any and all actions necessary to defend title to the Collateral against all persons and to defend the Security Interest of Secured Party in the Collateral and the priority thereof against any Lien not expressly permitted hereunder.

        (e)     **Disposition of Collateral**.  Grantor will not sell, lease or otherwise dispose of the Collateral or transfer or convey any assets of Retail, Builders or Management or any subsidiaries or affiliates except as permitted under the Loan Documents.

        (f)     **Liens**.  Grantor will not create, incur, or suffer to exist any Lien on the Collateral except the Security Interest created by this Agreement.

        (g)     **Change in Location, Jurisdiction of Organization or Name**.  Grantor will not (a) maintain a place of business at a location other than a location specified on

*Exhibit D*, (b) change their name or taxpayer identification number, (c) change their mailing address, or (d) change their jurisdiction of organization, unless in each case Grantor shall have given Secured Party not less than thirty (30) days' prior written notice thereof, and Secured Party shall have reasonably determined that such change will not adversely affect the validity, perfection or priority of Secured Party's Security Interest in the Collateral. Prior to making any of the foregoing changes, Grantor shall execute and deliver all such additional documents and perform all additional acts as Secured Party, in its sole discretion, may request in order to continue or maintain the existence and priority of its Security Interest in all of the Collateral.

(h)     **Other Financing Statements**.  Grantor will not sign or authorize the signing on their behalf of any financing statement naming it as debtor covering all or any portion of the Collateral, except for financing statements naming the Secured Party as secured party.

4.2.     **Securities**.  Grantor will (a) deliver to Secured Party immediately upon execution of this Agreement the originals of all certificates evidencing any Collateral, (b) hold in trust for Secured Party upon receipt and immediately thereafter deliver to Secured Party any future certificates evidencing Collateral or any accruals or rights associated therewith, and (c) upon Secured Party's request, deliver to Secured Party (and thereafter hold in trust for Secured Party upon receipt and immediately deliver to Secured Party) any other document evidencing or constituting Collateral.

4.3.     **Stock, Pledged Contract Rights and Receivables, and Other Ownership Interests**.

(a)     **Issuance of Securities**.  Grantor shall not permit any Pledged Equity Interest to at any time constitute a Security or consent to the issue of any such interests taking any action to have such interests treated as a Security unless (i) all certificates or other documents constituting such Security have been delivered to Secured Party and such Security is properly defined as such under Article 8 of the UCC of the applicable jurisdiction, whether as a result of actions by the issuer thereof or otherwise, or (ii) Secured Party has entered into a control agreement with the issuer of such Security or with a securities intermediary relating to such Security and such Security is defined as such under Article 8 of the UCC of the applicable jurisdiction, whether as a result of actions by the issuer thereof or otherwise.

4.4.     **Compliance with Agreements**.  Grantor shall comply in all material respects with all mortgages, deeds of trust, instruments, and other agreements binding on it or affecting their properties or business.

4.5.     **Compliance with Laws**.  Grantor shall comply, in all material respects, with all applicable laws, rules, regulations, and orders of any court or Governmental Authority.

4.6.     **Further Assurances**.  At any time and from time to time, upon the request of Secured Party, and at the sole expense of Grantor, Grantor shall promptly execute and deliver all such further instruments and documents and take such further action as Secured Party may deem

MWDOCS 2992840v.5

reasonably necessary or desirable (a) to assure Secured Party that its Security Interests hereunder are perfected with a first priority Lien and (b) to carry out the provisions and purposes of this Agreement, including (i) the filing of such financing statements as Secured Party may require, (ii) furnishing to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Secured Party may reasonably request, all in reasonable detail, and (iii) taking all actions required by law in any relevant UCC, or by other law as applicable in any foreign jurisdiction. Grantor shall promptly endorse and deliver to Secured Party all documents, instruments, and chattel paper that it now owns or may hereafter acquire with respect to the Collateral.

5.    **EVENTS OF DEFAULT**

     5.1.    **Remedies**.  Upon the occurrence and during the continuance of an Event of Default under the Loans or any other Loan Document, Secured Party may exercise any or all of the following rights and remedies:

          (a)    Those rights and remedies provided in this Agreement, the Notes, or any other Loan Document.

          (b)    Those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including any law governing the exercise of a bank's right of setoff or bankers' lien) when a Grantor are in default under a security agreement.

          (c)    Without notice except as specifically provided in *Section 8.1* or elsewhere herein, sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as Secured Party may deem commercially reasonable. Neither Secured Party's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale.

          (d)    During the existence of any Event of Default, all payments and distributions made on behalf of Grantor's Specified Stock Rights shall be paid or delivered to Secured Party (except that if the Secured Party has not taken any other material enforcement action upon written consent of Secured Party, the Grantor may receive Tax Distributions (as defined in the LLC Agreements of Retail, Builders and Management) and distribute same as "Tax Distributions" under the Loans, and Grantor agrees to take all such action as Secured Party may deem necessary or appropriate to cause all such payments and distributions to be made to Secured Party.  Further, Secured Party shall have the right, during the existence of any Event of Default, to notify and direct Retail, Builders and Management (subject as aforesaid with respect to Tax Distributions) to make all payments, dividends, and any other distributions payable in respect thereof directly to Secured Party.  Retail, Builders and Management shall be fully protected in relying on the written statement of Secured Party that it then holds a Security Interest which entitles it to receive such payments and distributions.  Any and all money

and other property paid over to or received by Secured Party hereunder shall be retained by as additional Collateral hereunder or applied to the Obligations.

(e)     Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "*Securities Act*") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Collateral conducted without prior registration or qualification of such Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Grantor acknowledge that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, Grantor agree that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it. If Secured Party determines to exercise its right to sell any or all of the Collateral, upon written request, Grantor shall furnish to Secured Party all such information as Secured Party may request in order to determine the number and nature of interest, shares or other instruments included in the Collateral which may be sold by Secured Party in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect. In case of any sale of all or any part of the Collateral on credit or for future delivery, such Collateral so sold may be retained by Secured Party until the selling price is paid by the purchaser thereof, but the Secured Party shall not incur any liability in case of the failure of such purchaser to take up and pay for such assets so sold and in case of any such failure, such Collateral may again be sold upon like notice. Secured Party, instead of exercising the power of sale herein conferred upon them, may proceed by a suit or suits at law or in equity to foreclose Security Interests created hereunder and sell such Investment Property, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(f)     If Secured Party sells any of the Collateral upon credit, Grantor will be credited only with payments actually made by the purchaser, received by Secured Party, and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Grantor shall be credited with the Proceeds of the sale.

5.2.     **Cure.** Grantor shall have ten (10) days following the occurrence of any Event of Default to cure such Default; provided, however, if the Default is capable of being cured but not within ten (10) days, Grantor shall have thirty (30) days to cure such Default.

6.     **WAIVERS, AMENDMENTS AND REMEDIES**. No delay or omission of Secured Party to exercise any right or remedy granted under this Agreement shall impair such right or

remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy.  No waiver, amendment or other variation of the terms, conditions or provisions of this Agreement whatsoever shall be valid unless in writing signed by Secured Party and then only to the extent in such writing specifically set forth.  All rights and remedies contained in this Agreement or by law afforded shall be cumulative and all shall be available to Secured Party until this Agreement has been terminated pursuant to *Section 8.11*.

7.    **PROCEEDS**

7.1.    **Application of Proceeds**.  Upon  the occurrence and during the continuation of an Event of Default, the Proceeds of the Collateral may be applied by Secured Party to payment of the Secured Obligations in such manner and order as Secured Party may elect in its sole discretion.

8.    **GENERAL PROVISIONS**

8.1.    **Notice of Disposition of Collateral**.  Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Grantor, addressed as set forth in *Section 9.1*, at least ten (10) days prior to (a) the date of any such public sale or (b) the time after which any such private sale or other disposition may be made. Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given.  Subject to the provisions of applicable law, Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Secured Party may further postpone such sale by announcement made at such time and place.

8.2.    **Secured Party Performance of Grantor' Obligations**.  Without having any obligation to do so, Secured Party may perform or pay any Obligations which Grantor have agreed to perform or pay in this Agreement, and Grantor shall reimburse Secured Party for any amounts paid by Secured Party pursuant to this *Section 8.2*.  Grantor' obligations to reimburse Secured Party pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

8.3.    **Authorization for Secured Party to Take Certain Action**.  Grantor irrevocably authorize Secured Party at any time and from time to time in the sole discretion of Secured Party, and appoints Secured Party as its attorney in fact, coupled with an interest, (a) to execute on behalf of Grantor as debtors and to file financing statements necessary or desirable in Secured Party's sole discretion to perfect and to maintain the perfection and priority of Secured Party's Security Interest in the Collateral, (b) during the existence of any Event of Default, to indorse and collect any cash Proceeds of the Collateral, (c)  to apply the Proceeds of any Collateral received by Secured Party to the Secured Obligations as provided in *Section 7* and (d) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such

Liens as are specifically permitted hereunder), and Grantor agree to reimburse Secured Party on demand for any payment made or any expense incurred by Secured Party in connection therewith, *provided that* this authorization shall not relieve Grantor of any of their obligations under this Agreement or under the Notes.

8.4.    **Specific Performance of Certain Covenants**.  Grantor acknowledges and agrees that a breach of any of the covenants contained in *Sections 4.1(d)*, *4.1(f)*, *4.2*, or *8.7* or in *Section 7* will cause irreparable injury to Secured Party, that Secured Party has no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of Secured Party to seek and obtain specific performance of other Obligations of Grantor contained in this Agreement, that the covenants of Grantor contained in the Sections referred to in this *Section 8.4* shall be specifically enforceable against Grantor.

8.5.    **Reserved.**

8.6.    **Dispositions Not Authorized**.  Grantor are not authorized to sell or otherwise dispose of the Collateral, except for dispositions permitted under the Notes, and notwithstanding any course of dealing between Grantor and Secured Party or other conduct of Secured Party, no authorization to sell or otherwise dispose of the Collateral (except as permitted under the Notes) shall be binding upon Secured Party unless such authorization is in writing signed by Secured Party.

8.7.    **Benefit of Agreement**.  The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Grantor, Secured Party and their respective successors and assigns, except that Grantor shall not have the right to assign their rights or delegate their Obligations under this Agreement or any interest herein, without the prior written consent of Secured Party.

8.8.    **Survival of Representations**.  All representations and warranties of Grantor contained in this Agreement shall survive the execution and delivery of this Agreement.

8.9.    **Taxes and Expenses**.  Any taxes (including income taxes) payable or ruled payable by Federal or State authority in respect of this Agreement shall be paid by Grantor, together with interest and penalties, if any.  Grantor shall reimburse Secured Party for any and all out-of-pocket expenses and internal charges (including reasonable attorneys', auditors' and accountants' fees) paid or incurred by Secured Party in connection with the preparation, execution, delivery, and administration of this Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral). In addition, Grantor shall be obligated to pay all of the costs and expenses incurred by Secured Party, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Secured Obligations, or in the prosecution or defense of any action or proceeding by or against Secured Party or Grantor concerning any matter arising out of or connected with this Agreement, any Collateral or the Secured Obligations, including any of the foregoing arising in, arising under or related to a case under any bankruptcy, insolvency or similar law.   Any and all costs and expenses incurred by Grantor in the performance of actions required pursuant to the terms hereof shall be borne solely by Grantor.

8.10.   **Headings**.   The title of and Section headings in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Agreement.

8.11.   **Termination**.   This Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until (a) the Notes has terminated pursuant to its express terms and (b) all of the Secured Obligations (except Secured Obligations consisting of contingent indemnification provisions for which no claim has been asserted) have been paid in full in cash in full and no commitments of Secured Party which would give rise to any Secured Obligations are outstanding; *provided that* any termination of this Agreement under this *Section 8.11* is subject to *Section 8.18.*   Upon any such termination, the Secured Party shall (i) return any original certificates evidencing the Pledged Contract Rights and Receivables previously delivered by the Grantor to the Secured Party, (ii) authorize, at the expense of the Grantor, UCC-3 termination statements to be filed terminating financing statements filed to perfect the Security Interests and (iii) at the expense of the Grantor, take such other actions as the Grantor may reasonably request to reflect such termination.

8.12.   **FINAL AGREEMENT**.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

8.13.   **CHOICE OF LAW**.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ARKANSAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO FEDERALLY INSURED FINANCIAL INSTITUTIONS.

8.14.   **INDEMNITY**.   GRANTOR DOES HEREBY ASSUME ALL LIABILITY FOR THE COLLATERAL, FOR THE SECURITY INTEREST OF SECURED PARTY, AND FOR ANY USE, POSSESSION, MAINTENANCE, AND MANAGEMENT OF, ALL OR ANY OF THE COLLATERAL, INCLUDING ANY TAXES ARISING AS A RESULT OF, OR IN CONNECTION WITH, THE TRANSACTIONS CONTEMPLATED HEREIN, AND AGREES TO ASSUME LIABILITY FOR, AND TO INDEMNIFY AND HOLD SECURED PARTY AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES HARMLESS FROM AND AGAINST, ANY AND ALL CLAIMS, CAUSES OF ACTION, OR LIABILITY, FOR INJURIES TO OR DEATHS OF PERSONS AND DAMAGE TO PROPERTY, HOWSOEVER ARISING FROM OR INCIDENT TO SUCH USE, POSSESSION, MAINTENANCE, AND MANAGEMENT, WHETHER SUCH PERSONS BE AGENTS OR EMPLOYEES OF GRANTOR OR OF THIRD PARTIES, OR SUCH DAMAGE BE TO PROPERTY OF GRANTOR OR OF OTHERS.   GRANTOR DOES HEREBY INDEMNIFY, SAVE, AND HOLD SECURED PARTY AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES HARMLESS FROM AND AGAINST, AND COVENANTS TO DEFEND SECURED PARTY AGAINST, ANY AND ALL LOSSES, DAMAGES, CLAIMS, COSTS, PENALTIES, LIABILITIES, AND EXPENSES (COLLECTIVELY, "*CLAIMS*"), INCLUDING COURT COSTS AND ATTORNEYS' FEES, **AND ANY OF THE FOREGOING ARISING FROM THE**

12

NEGLIGENCE OF SECURED PARTY OR ANY OF THEIR RESPECTIVE OFFICERS, EMPLOYEES, AGENTS, ADVISORS, EMPLOYEES, OR REPRESENTATIVES AND RELATING TO THE COLLATERAL, HOWSOEVER ARISING OR INCURRED BECAUSE OF, INCIDENT TO, OR WITH RESPECT TO COLLATERAL OR ANY USE, POSSESSION, MAINTENANCE, OR MANAGEMENT THEREOF; *PROVIDED, HOWEVER,* THAT THE INDEMNITY SET FORTH IN THIS ***SECTION 8.14*** WILL NOT APPLY TO CLAIMS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SECURED PARTY OR ANY OF THEIR RESPECTIVE OFFICERS, EMPLOYEES, AGENTS, ADVISORS, EMPLOYEES, OR REPRESENTATIVES, AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN FINAL AND NONAPPEALABLE JUDGMENT.

8.15.   **Limitation of Obligations**.

(a)     The provisions of this Agreement are severable, and in any action or proceeding involving any applicable law affecting the rights of creditors generally, if the Obligations of Grantor under this Agreement would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of Grantor' liability under this Agreement, then, notwithstanding any other provision of this Agreement to the contrary, the amount of such liability shall, without any further action by Grantor or Secured Party, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being Grantor' "***Maximum Liability***").

(b)     Notwithstanding any or all of the Secured Obligations becoming unenforceable against Grantor or the determination that any or all of the Secured Obligations shall have become discharged, disallowed, invalid, illegal, void or otherwise unenforceable as against Grantor (whether by operation of any present or future law or by order of any court or governmental agency), the Secured Obligations shall, for the purposes of this Agreement, continue to be outstanding and in full force and effect.

8.16.   **Reserved**.

8.17.   **Reserved**.

8.18.   **Recovered Payments**.  The Secured Obligations shall be deemed not to have been paid, observed or performed, and the Grantor' obligations under this Agreement in respect thereof shall continue and not be discharged, to the extent that any payment, observance or performance thereof by Grantor are recovered from or paid over by or for the account of Secured Party for any reason, including as a preference or fraudulent transfer or by virtue of any subordination (whether present or future or contractual or otherwise) of the Secured Obligations, whether such recovery or payment over is effected by any judgment, decree or order of any court or governmental agency, by any plan of reorganization or by settlement or compromise by Secured Party (whether or not consented to by Grantor) of any claim for any such recovery or payment over.  Grantor hereby expressly waive the benefit of any applicable statute of limitations and agrees that it shall be liable hereunder whenever such a recovery or payment over occurs.

MWDOCS 2992840v.5

9.    **NOTICES**

9.1.    **Sending Notices**.  Whenever any notice is required or permitted to be given under the terms of this Agreement, the same shall, except as otherwise expressly provided for in this Agreement, be given in writing, and sent by: (a) certified mail, return receipt requested, postage pre-paid;  (b) a national overnight delivery service;  (c) hand delivery with written receipt acknowledged; or (d) facsimile, followed by a copy sent in accordance with *clause (b)* or *(c)* of this *Section 9.1* sent the same day as the facsimile, in each case to the address or facsimile number (together with a contemporaneous copy to each copied addressee), as applicable, set forth in *Exhibit D*.  Grantor and Secured Party shall not conduct communications contemplated by this Agreement by electronic mail or other electronic means, except by facsimile transmission as expressly provided in this *Section 9.1*, and the use of the phrase "in writing" or the word "written" shall not be construed to include electronic communications except by facsimile transmissions as expressly provided in this *Section 9.1*.  Any notice required or given hereunder shall be deemed received the same Business Day if sent by hand delivery or facsimile, the next Business Day if sent by overnight courier, or three (3) Business Days after posting if sent by certified mail, return receipt requested; *provided that* any notice received after 5:00 p.m. Dallas, Arkansas time on any Business Day or received on any day that is not a Business Day shall be deemed to have been received on the following Business Day.

9.2.    **Change in Address for Notices**.  Grantor and Secured Party may change the address for service of notice upon it by a notice in writing to the other parties.

9.3    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any signature delivered by a party to this Agreement by facsimile or other form of electronic transmission shall be deemed to be an original signature hereto.

MWDOCS 2992840v.5

IN WITNESS WHEREOF, Grantor and Secured Party have executed this Agreement as of the date first above written.

GRANTOR:

**FIRST CAPITAL REAL ESTATE ADVISORS, LP.**,
a Delaware limited partnership

By:  **FCREI GP, LLC**, a Delaware limited liability company

By: _____
Its: _____

SECURED PARTY:
**HEARTLAND BANK, AN ARKANSAS STATE BANK**

By: _____
     Mark Hoffpauir, Chief Credit Officer

Date: _____November 28_____, 2016

Signature Page to
Pledge Agreement

MWDOCS 2992840v.5

## EXHIBIT A

### List of Pledged Contract Rights and Receivables

"*Pledged Contract Rights and Receivables*" means all right, title and interest, present or future, of the Grantor, to, under and in respect of the right to receive any and all fees and other amounts due and payable to Debtor, including but not limited to any and all Acquisition Fees, Acquisition Expenses, Real Estate Disposition Commissions, Asset Management Fees, Financing Coordination Fees, any and all subordinated shares of excess cash flows, as applicable and Oversight Fees, due to Debtor, pursuant to that certain Advisory Agreement dated August 15, 2012, by and between First Capital Real Estate Trust Incorporated (f/k/a United Realty Trust Incorporated), a Maryland corporation, and any successor in interest, and First Capital Real Estate Operating Partnership, LP (f/k/a United Realty Capital Operating Partnership, L.P.), a Delaware limited partnership and the Grantor.

## EXHIBIT B

### UCC Filing Jurisdictions

| Grantor | Jurisdiction |
|---|---|
| First Capital Real Estate Advisors, LP | Delaware |
|  |  |
|  |  |

## EXHIBIT C

### Federal Employer Identification Number

| Grantor | Federal Employer Identification Number |
|---|---|
| First Capital Real Estate Advisors, LP | 45-2841938 |

## EXHIBIT D

### Principal Place of Business and Mailing Address:

#### Attention:

Suneet Singal
2377 Gold Meadow Way, Ste. 100
Gold River, CA 95670
Fax No.:_____

Exhibit D to Pledge Agreement

## EXHIBIT D

**Principal Place of Business and Mailing Address:**

**Attention:**

Suneet Singal
_____

Fax No.:_____